UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CONTINENTAL WESTERN | * | |
| INSURANCE COMPANY, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 14-14226-MGM |
| PREFERRED MUTUAL | * | |
| INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM OF DECISION, FINDINGS OF FACT,

AND RULINGS OF LAW

August 10, 2017

MASTROIANNI, U.S.D.J.

The present action concerns a claimed violation of Massachusetts General Laws, Chapter

93A, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in

the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Continental Western

Insurance Company ("Plaintiff" or "Continental") alleges Preferred Mutual Insurance Company

("Defendant" or "Preferred Mutual") engaged in such acts and practices by filing claims for

declaratory judgment and rescission against Defendant's insured without first conducting a

reasonable investigation in violation of Massachusetts General Laws ch. 176D, § 3(9). *See id.* ch.

176D, § 3(9)(d) (requiring a "reasonable investigation based upon all available information" before

1

"[r]efusing to pay claims"). Continental seeks damages in the amount of attorney's fees incurred as a result of its participation in Defendant's actions for rescission and declaratory judgment, in which Continental became involved to protect its potential subrogation rights against Defendant's insured. The parties have stipulated Plaintiff has suffered such damages.

After a bench trial conducted January 9–12, 2017, the court makes the following findings of fact and conclusions of law. In so finding and concluding, the court takes into account the weight, credibility, and probative value of all the evidence presented at trial, and draws reasonable inferences therefrom.

## GENERAL FINDINGS OF FACT

1. Leonard C. Lodigiani ("Lodigiani") is a Master Plumber and contractor. Lodigiani has operated a plumbing business (trade name LB Plumbing) for approximately thirty years. Evans Brantley ("Brantley") is a Journeyman Plumber.[1] At the time of the events underlying this case, Lodigiani was 84 years old and Brantley 80 years old.

2. An acquaintance of Lodigiani's, Brantley occasionally alerted Lodigiani to plumbing jobs. In the fall of 2012, Brantley approached Lodigiani about a commercial renovation project at 24 Bridge Street in South Hadley, Massachusetts ("the Bridge Street project"). Lodigiani agreed he would complete the project with Brantley participating in the work, and it was agreed all profits would be split evenly between them. Lodigiani then entered into two written contracts in early September 2012 with Adnan Yildirim ("Yildirim"), lessee of the commercial space to be

---

[1] A Journeyman Plumber is one who has completed a state-mandated apprenticeship of a specific length, but has not yet fulfilled the requirements of becoming a Master Plumber. *See* Office of Consumer Affairs & Business Regulation, *Frequently Asked Questions About Board of State Examiners of Plumbers and Gas Fitters*, MASS.GOV, http://www.mass.gov/ocabr/licensee/dpl-boards/pl/faqs.html (last visited July 28, 2017) (discussing Massachusetts requirements for becoming a Journeyman Plumber).

improved, to perform the renovations. Lodigiani signed the contracts personally; Brantley was not a party thereto.

3. Lodigiani obtained workers' compensation insurance as well as commercial liability insurance to cover the Bridge Street project. He applied first for workers' compensation insurance on October 26, 2012. The application categorized Lodigiani as a "sole proprietor" and listed his ownership interest in LB Plumbing as one hundred percent. Approximately two months later, on December 18, 2012, Lodigiani obtained a commercial liability policy underwritten by Preferred Mutual. The application listed Lodigiani as an "individual" entity and indicated he was not, and had not previously been, involved in a joint venture. It also listed an annual employee payroll of $10,000. The effective dates of the policy were December 18, 2012 to December 18, 2013. Evans Brantley had his own policy of insurance in effect from 2012–2013.[2]

4. On January 28, 2013, a fire broke out at the Bridge Street project. At the time of the fire, Continental insured the property owner, C&K II, LLP ("C&K"). Continental reserved $500,000 to cover the property damage, ultimately paying C&K approximately $502,134.11, the cost of repairs.

5. Given the contracts and permits governing the renovation, Lodigiani's liability policy with Preferred Mutual would have been implicated if the plumbing work had caused the fire. Indeed, on January 31, 2013, Continental put Lodigiani on notice of a possible liability suit against him. Preferred Mutual immediately assigned claims specialist Raymond Kagels ("Kagels") to investigate. On February 1, 2013, Kagels received authorization from his manager, David Bogdan ("Bogdan"), to hire several individuals to aid in the investigation. These individuals included cause and origin expert Richard Splaine ("Splaine") and outside counsel Joseph Doyle ("Doyle"). On or around that date, Kagels also hired independent adjuster James Trudeau

---

[2] The exact dates the policy was in force have not been specified.

("Trudeau"). Doyle was assigned to represent Lodigiani's interests in any potential liability suit against him. As such, Doyle and Lodigiani became involved in a tripartite relationship, or one in which an insurance company engages and pays for the services of an attorney hired to represent the company's insured in any lawsuits implicating the insured's policy. The relationship is so called because in addition to the interests of the insured, the attorney represents the interests of a second client—the insurance company.

6. On February 7, 2013, Lodigiani and Doyle attended a scene inspection at 24 Bridge Street. Also present at the scene inspection was a fire investigator from Splaine's office and an unidentified public adjuster. In front of these individuals, Doyle "explained to [Lodigiani] who I was; that I represented him; that this was the public adjuster and that this was the cause and origin person, and that we were going to ask [Lodigiani] about what had occurred and that this conversation would be considered privileged and it would be shared only amongst ourselves and with Preferred Mutual." At trial, Doyle claimed that during the ensuing conversation, Lodigiani stated that on the day of the fire he had been working on the premises "with [his] partner." Doyle observed and noted possible cognitive issues with Lodigiani at this meeting.

7. Following the scene investigation, on February 28, 2013, Trudeau obtained from Lodigiani a recorded statement. In response to questions from Doyle and Trudeau, Lodigiani made statements similar to those he had made at the fire scene. Specifically, Lodigiani stated that he and Brantley were "partners," that Lodigiani had agreed to do the Bridge Street project as "partners" with Brantley, and that the pair would be splitting the profits evenly. At the same time, Lodigiani stated his business was a "sole proprietorship." The conversation proceeded as follows:

> Doyle:      You have a sole proprietorship right, Leo?
>
> Lodigiani:  Yes.

> Doyle:      [A]nd . . . but for this particular job on Bridge Street, you agreed to do it as partners with Evans Brantly [sic]?
> Lodigiani:  That's correct.

Neither Trudeau nor Doyle attempted to reconcile these seemingly inconsistent characterizations of Lodigiani's business. Further, Lodigiani's answers came in response to a leading question by Attorney Doyle, a leading question that, in the context of the tripartite relationship, was to Lodigiani's detriment and Preferred Mutual's advantage with respect to coverage under Lodigiani's individual policy.

8.  On March 18, Doyle reported to Kagels regarding the defensibility of a potential liability suit against Lodigiani. In an email Doyle wrote, "[Lodigiani] agreed that [he] would apply for the plumbing permit, that [he and Brantley] would work the job together and hire workers as needed," and that Brantley and Lodigiani had planned for the profits to be "split between them 50/50." Doyle also noted Lodigiani "may have some cognitive deficiencies." Later that day, Kagels and Doyle spoke on the phone. During the phone call, Doyle told Kagels that Lodigiani had used the word "partners" both at the fire scene and during the recorded statement to describe his business relationship with Brantley. Doyle did not intend to convey a legal opinion or conclusion regarding the nature of Lodigiani's business by using the word "partners." He meant only to inform Kagels that Lodigiani had himself used the term. At the same time, Doyle failed to mention Lodigiani's indication during the recorded statement that he operated a sole proprietorship, a term squarely at odds with Lodigiani's use of the term partners. Kagels did nothing to clarify the context, details, or import of Lodigiani's references to Brantley as his "partner."

9.  After receiving Doyle's report and speaking with him by phone on March 18, Kagels memorialized his understanding of Doyle's statements in multiple communications, including an email to Bogdan, entries in the claim notes, and a memorandum to Preferred Mutual's

underwriting department. In the claim notes, Kagels indicated Lodigiani was 84 years old and Brantley 80. In each communication, Kagels unequivocally referred to Lodigiani as operating a "partnership."

10. Bogdan summarily accepted and acted on Kagels's conclusion. On March 20, 2013, Bogdan replied to Kagels's March 18 email, in which Kagels had informed him Lodigiani and Brantley were engaged in a partnership. In that email, Kagels had written that he was "inclined to forego the coverage battle to avoid alienating an insured who we will need strongly in our corner on defense." Bogdan nonetheless advised, "[w]e should definitely send out" a reservation of rights ("ROR") letter declaring Preferred Mutual's right to potentially disclaim coverage on the basis of an undisclosed partnership. Bogdan further instructed Kagels to "set up" Lodigiani for an examination under oath ("EUO") and acknowledged, "This has the potential of a big exposure case and we can't ignore the coverage issue at hand." In addition, Bogdan authorized the hiring of coverage counsel John Stewart ("Stewart") to conduct an independent investigation of the coverage issue.

11. Stewart had been retained by Preferred Mutual in the past. He and Kagels maintained a longstanding and mutually respectful business relationship and Stewart held Kagels in high esteem. Asked about his understanding of Kagels's background, experience, and reputation, Stewart responded, "Significant. He . . . was an Ivy League graduate. He has a CPCU [Chartered Property Casualty Underwriter designation] which is a very significant thing in the insurance world. It basically is a master's level type work in seven different areas, claims being one of them, underwriting. I don't know much about it, but it's a pretty impressive background. It's the highest insurance designation that you could have in the property and casualty field." Asked, "Did Mr. Kagels at all times appear to be a competent and experienced claims professional?" Stewart answered, "Very much so."

12. As Bogdan had instructed, Kagels issued Lodigiani an ROR on March 22, 2013. The letter stated, "It has come to [Preferred Mutual's] attention during the course of our investigation of this matter that you were operating as a partnership with another plumber on this job." Kagels stated Preferred Mutual "do[es] not insure a partnership" and that "[a]s a result, a question as to the applicability of your insurance policy to [the fire] loss has now arisen." The letter went on to inform Lodigiani that Preferred Mutual's attorney would be in touch to arrange an examination under oath ("EUO").

13. On March 27, 2013, Stewart informed Lodigiani by letter that Lodigiani's policy "require[d]" Lodigiani to submit to an EUO. The letter carefully noted Lodigiani could retain his own lawyer "so long as that counsel ha[d] no conflict of interest with representing [him] with respect to PMIC's investigation."

14. Kagels inquired of Doyle whether Stewart should focus exclusively on the coverage issue during the EUO or delve into the events surrounding the fire more generally. Doyle suggested Preferred Mutual "get everything on the record that we can considering the insured's advanced age." The fact that Lodigiani may have some cognitive impairments was again noted.

15. The EUO took place on May 1, 2013. Stewart spent a considerable amount of time exploring the legal relationship between Lodigiani and Brantley. Lodigiani consistently testified he considered Brantley his employee, including when asked to "put [Brantley] in a category between employee or independent contractor or partner." Lodigiani further testified Brantley had to have been Lodigiani's employee because Massachusetts plumbing regulations do not allow partnerships between Master and Journeyman plumbers. According to Stewart, Lodigiani was cooperative, "lucid" and "seemed to have no cognitive difficulties."

16. Stewart formalized his opinions about the May 1 EUO in a letter to Kagels dated May 7. In the letter, Stewart concluded "[t]he evidence that Mr. Lodigiani was actually engaged in a partnership

with Elvins [sic] Brantley appears thin," that "[Preferred Mutual] would have difficulty in sustaining the burden of proving Mr. Lodigiani was involved in a partnership with Elvins [sic] Brantley," and that "[a]t this point there is nothing which points decisively to the fact that Mr. Lodigiani was in a partnership with Elvins [sic] Brantley at the time [Lodigiani] applied for a policy from [Preferred Mutual]." The bases for Stewart's conclusions included, but were not limited to, the following observations: (1) "Yildirim stated he hired Mr. Lodigiani directly."; (2) "Mr. Lodigiani took out permits in his own name."; (3) "Since Mr. Lodigiani was the permit holder, he was legally responsible for the job . . . ."; (4) "Mr. Lodigiani stated that the one part time employee" listed on Lodigiani's businessowner's insurance application "was Mr. Brantley, and that payroll was to pay him"; (5) Lodigiani considered both Brantley and the two day workers involved in the project to be "his employees," and all three "were clearly subject to [Lodigiani's] direction and control"; (6) "[Lodigiani] was in control of operations at the jobsite and had the right to control the work of Mr. Brantley," which was "enough for Mr. Brantley to be held to be Mr. Lodigiani's employee," and; (7) "There seems to be force in Mr. Lodigiani's assertion that he could not be a partner with a journeyman plumber, according to the [Massachusetts] regulations." Stewart surmised Lodigiani, now represented by his own private counsel, had denied a partnership with Brantley because Lodigiani was "wise to th[e] fact" that such a finding could jeopardize his coverage. Stewart indicated his finding of no partnership could be revisited "[i]f there is additional information that not only casts doubt on Mr. Lodigiani's assertion Mr. Brantley was his employee, but that positively tends to show the men were partners." Stewart's letter did not contain any discussion about whether Preferred Mutual had a legal right to rescind Lodigiani's policy on the basis of a misrepresentation as to the structure of Lodigiani's business on the businessowner's insurance application.

17. After reviewing Stewart's May 7 letter, Kagels recorded in the claim notes his disbelief as to Lodigiani's testimony at the EUO. Kagels wrote, "[Insured] took the position he was a Master Plumber and would not be allowed to have a Journeyman as a partner. I am not buying that. Partners don't have to be equals."

18. Kagels, having already concluded Lodigiani had operated a partnership, endeavored to provide such additional information justifying Stewart's revisiting his conclusion. On May 8, Kagels wrote to Stewart, stating, "It seems you were given a much different story than Joe Doyle was by the insured. The EUO does not square with the report from [Doyle] dated 3/18/13." Kagels requested Stewart review Doyle's report and "let me [Kagels] know if this changes your opinion on the matter." Stewart reviewed Lodigiani's EUO and Doyle's March 18 report. In a May 10 email, he agreed with Kagels that "there [was] a difference between what Mr. Lodigiani swore to in his EUO vs. what he told Joe Doyle." Deviating from his prior recommendation, Stewart labeled Doyle's report "circumstantial evidence of a 50/50 partnership." Although this conclusion better aligned with Kagels's, Stewart continued to voice reservations about filing suit against Lodigiani, stating he remained "reluctant to recommend much be  done with the partnership issue since there is equal or greater evidence pointing to Mr. Brantley being an employee." Stewart nonetheless fueled Kagels's beliefs about Lodigiani, opining Lodigiani had "changed his story after he lawyered up" and had become "wise to" the partnership issue.

19. After Stewart again advised against suit in his May 10 email, Kagels recommenced efforts to influence Stewart's recommendation, furnishing yet more supplementary information. That same day, Kagels wrote Stewart stating he had "just learned" of the February recorded statement. After receiving transcripts of the recorded statement, Kagels forwarded them to Stewart on May 13, 2017, writing, "I guess [Lodigiani] has not been exactly truthful with us." This statement was

a reference to what Kagels considered to be Lodigiani's inconsistent use of the word "partner" at the recorded statement and denial of a partnership at the EUO.

20. After being twice asked by Kagels to reconsider his recommendation on the basis of "new" evidence, Stewart's opinion shifted in a May 22 letter to Kagels. While Stewart voiced concerns about the strategic value of filing suit against Lodigiani, he now reported a jury could credit Preferred Mutual's position as to partnership at trial and advised, "[Preferred Mutual] is entitled to . . . commence a Declaratory Judgment suit."

21. On June 4, 2013, Kagels directed Stewart to set up a second EUO. The purpose of the second EUO was to "confront [Lodigiani] with [his] prior statements" on the issue of partnership. The second EUO took place on June 21, 2013.

22. Stewart reported on the second EUO in a letter dated June 21, 2013. In the letter, Stewart stated Lodigiani had again testified that he was not in a partnership with Brantley. In fact, Lodigiani had testified he took the 24 Bridge Street job to help Brantley out and that in describing Brantley as his "partner," he had not meant to imply a legal partnership. Lodigiani had also testified that although he and Brantley had agreed to split the profits, all Lodigiani was paying Brantley for was Brantley's work on the job. Inserting an illustration from *Through the Looking Glass* by Lewis Carroll, Stewart expressed his disbelief of Lodigiani's statements. Beneath an illustration of Humpty Dumpty sitting on a wall looking down at Alice, is a caption which reads: "'When *I* use a word,' . . . 'it means what I choose it to mean—neither more nor less.'" The illustration was meant to convey Stewart's belief that Lodigiani was lying about his relationship with Brantley by purposefully misusing legal terms. This in turn shows that by June 21, Stewart's opinion had changed completely to align with Kagels's finding of partnership.

23. On July 2, 2013, Kagels, Bogdan, in-house counsel James Dolan, and Stewart participated in a conference call to make a final decision as to whether to file declaratory judgment and rescission

actions against Lodigiani. During the call they decided to recommend rescission to the underwriting department, and tasked Stewart with drafting a complaint for declaratory judgment as well as a rescission letter. The decision was unanimous and made with no meaningful discussion or debate.

24. On July 11, Kagels, Bogdan, Stewart, claims manager Sean Campbell, and underwriter Michael Griffin participated in a second conference call. During the call, they reviewed the declaratory judgment complaint and the rescission letter Stewart had prepared, and approved the issuance of the rescission letter to Lodigiani. The decision was unanimous without any meaningful discussion or debate.

25. In a letter dated July 22, 2013, Preferred Mutual informed Lodigiani, his attorney, and his insurance agent of its decision to pursue rescission and to request declaratory judgment based on Preferred Mutual's determination that Lodigiani was operating an "undisclosed joint venture or partnership" with Brantley.

26. On July 25, 2013, Preferred Mutual filed a lawsuit against Lodigiani. Preferred Mutual argued that in applying for the policy, Lodigiani had claimed he was a sole proprietor when in fact he had been engaged in a partnership with Brantley. In Preferred Mutual's view it was therefore entitled to rescission and declaratory judgment in its favor on the basis of this alleged misrepresentation.

## LEGAL STANDARD

Chapter 93A of the Massachusetts General Laws prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. Laws ch. 93A, § 2, "and authorizes businesses to sue one another for engaging in such practices." *Ora Catering, Inc. v. Northland Ins. Co.*, 57 F. Supp. 3d 102, 109–10 (D. Mass. 2014) (citing Mass. Gen. Laws ch. 93A, §§ 2, 11); *see also M.*

*DeMatteo Constr. Co. v. Century Indem. Co.*, 182 F. Supp. 2d 146, 160 (D. Mass. 2001) (explaining businesses may sue one another under chapter 93A, § 11, but to do so "must 'satisfy the elements of a claim based on an alleged unfair and deceptive practice under section 2 of Chapter 93A'" (quoting *RLI Ins. Co. v. Gen. Star Indem. Co.*, 997 F. Supp 140, 151 (D. Mass. 1998))). The purpose of Chapter 93A is to "'encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices.'" *Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc.*, No. 13–11302–NMG, 2014 WL 1203106, at *7 (D. Mass. Mar. 19, 2014) (internal quotation marks omitted) (quoting *In re Pharma. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009)). In considering whether a chapter 93A violation has occurred, Massachusetts courts look to the following three factors: "'1) whether the practice falls within the penumbra of common-law, statutory, or other established concepts of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; and 3) whether it causes substantial injury to consumers, competitors or other businessmen.'" *Bridge Over Troubled Waters, Inc. v. Argo Tea, Inc.*, 220 F. Supp. 3d 213, 220 (D. Mass. 2016) (quoting *Boyle Int'l Truck & Engine Corp.*, No. 01–10039–DPW, 2002 WL 823810, at *6 (D. Mass. Apr. 23, 2002)). In the context of the insurance industry, violations of Massachusetts General Laws chapter 176D, § 3 may "'support liability under sections 2 and 11 of chapter 93A.'" *DeMatteo*, 182 F. Supp. 2d at 162 (quoting *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 15 (D. Mass. 1997)); *see also Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 9 (1st Cir. 2000) ("[C]onduct that violates ch. 176D may independently be an unfair trade practice actionable under ch. 93A, § 11." (citing *Kiewit Constr. Co. v. Westchester Fire Ins. Co.*, 878 F. Supp. 298, 301–02 (D. Mass. 1995))), but do not constitute *per se* violations of 93A. *See Ora Catering*, 57 F. Supp. 3d at 110 ("A violation of Chapter 176D is *not automatically* a violation of Chapter 93A § 11." (emphasis in original) (citing *Brazas*, 220 F.3d at 9)). Among these violations are 176D, § 3(9), which

classifies "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information" as an unfair claim settlement practice. Mass. Gen. Laws ch. 176D, § 3(9).

A claimant who prevails in showing it was the victim of an unfair and deceptive trade practice is entitled to damages. *See* Mass. Gen. Laws ch. 93A, § 11. Where the unfair and deceptive trade practice was "a willful or knowing violation" of chapter 93A, § 11, damages must be doubled and may be trebled. *Id.* ("If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or act or practice was a willful or knowing violation of [93A]."). Establishing a "willful or knowing violation" requires "proof of a significant level of 'rascality,' typically involving 'immoral, unethical, oppressive, or unscrupulous' behavior." *Pizzo v. Gambee*, 754 F. Supp. 2d 234, 238 (D. Mass. 2010) (quoting *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1484 (1st Cir. 1996)). A "subjectively culpable" mind is also required. *Id.*; *see also In re Pharma. Indus. Average Wholesale Price Litig.*, 520 F. Supp. 2d at 272 ("To establish a 'willful or knowing' violation, there must be some evidence that defendant has a subjectively culpable state of mind." (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475 (1991))). "A willful state of mind requires acts of defendant committed with an intention to deceive, or with the conscious objective of acting unfairly or deceptively. A knowing act exists for purposes of 93A where a defendant is aware that his act is unfair or deceptive or will cause such a result." *Labouf v. St. Laurent*, No. 051869, 2010 WL 3328012, at *1 (Mass. Super. July 28, 2010) (citations omitted).

At issue here is whether Preferred Mutual failed to conduct a reasonable investigation about Lodigiani's business structure before filing suit against its insured, thereby engaging in an unfair act

prohibited by chapter 93A.[3] For the reasons that follow, the court finds Preferred Mutual's investigation was unfair and deceptive.

## CONCLUSIONS OF LAW

### A. Outcome determinative investigation

1. Preferred Mutual's investigation was unfair and deceptive in violation of chapter 93A in that it was motivated by a predetermined, biased conclusion against Lodigiani made by Kagels on March 18, 2013 that Lodigiani was operating a partnership. There is significant evidence Kagels had so concluded. After speaking with Attorney Doyle, Kagels wrote Bogdan, "I was not previously aware that this insured was operating as a partnership." That same evening, Kagels wrote in the claim notes that "it turne[d] out [Lodigiani] was operation [sic] in a partnership" and that he had written to Bogdan "regarding potential coverage issue over partnership." The next morning Kagels submitted to the underwriting department a memorandum stating "insured was operating as a partnership." Moreover, in deposition testimony admitted at trial, Kagels explicitly acknowledged he had so concluded on March 18. It was unfair for Kagels to come to such a conclusion based on the very limited information he received from Doyle and without even a minimal parsing of detail or context to determine whether Lodigiani had used the term colloquially and/or without benefit of a discussion of legal terminology with the lawyer Preferred Mutual hired for him.

2. The March 22 ROR Kagels wrote is further evidence of unfair and deceptive conduct on Preferred Mutual's part. The letter states that during the course of Preferred Mutual's investigation, it had discovered evidence Lodigiani was engaged in a partnership. Yet, despite the letter suggesting otherwise, by March 22 no meaningful or reasonable investigation had

---

[3] The question of whether Preferred Mutual's violation of the statute was willful or knowing will be reserved for the damages phase of trial.

occurred. Indeed, Stewart, the person Preferred Mutual hired to assess the partnership issue, had been involved for at most a day.

3. Preferred Mutual placed far too much weight on Lodigiani's reference to Brantley as his "partner" at the fire scene when he met Attorney Doyle and in his subsequent recorded statement; this was particularly unfair in light of the fact that Doyle had, at that time, questioned Lodigiani's cognitive functioning. An insurer must consider the context of an individual providing information.

4. Kagels not only prematurely labeled Lodigiani and Brantley's relationship a partnership, but also allowed his predetermination to dictate the result of Stewart's purported investigation. After receiving Stewart's May 7 letter, which advised against a finding of partnership, Kagels endeavored to change Stewart's mind by providing additional information in the form of Doyle's March 18 report. When this failed to change Stewart's opinion, Kagels again provided supplementary information, this time in the form of recorded statement transcripts. As a general matter, it was unfair and deceptive for Preferred Mutual to interfere with the investigation and opinion of independent counsel. More specifically, it was unfair and deceptive to present the recorded statement transcripts as "additional information"; Kagels had known since his March 18 conversation with Doyle that Lodigiani had used the word "partners" and could have imparted this information to Stewart whether in possession of the transcripts or not. Kagels's representation to Stewart that the transcript contained new information belies an obvious desire to manipulate the outcome of Stewart's investigation. It created an illusion of new evidence, allowing Kagels to pressure Stewart into revisiting his conclusion. This manipulation was unfair and deceptive. It also reveals another issue with Preferred Mutual's investigation, namely, that Kagels precipitously dismissed Stewart's advice without any evaluation thereof. In *Bohn v. Vt. Mut. Ins. Co.*, 922 F. Supp. 2d 138, 149 (D.

Mass. 2013), the District of Massachusetts held "an insurer violates [chapter 176D] by purposefully and strategically failing to pursue a line of inquiry because it would uncover unfavorable evidence." Relying on manipulation rather than an impartial evaluation of the questions raised by Stewart in his May 7 letter, Preferred Mutual purposefully and strategically failed to pursue certain lines of inquiry raised by Stewart that would have uncovered favorable evidence. This was also unfair and deceptive.

5.  It was unfair and deceptive for Preferred Mutual not to consider that, at the same time Lodigiani referred to Brantley as his partner (February 28, 2013), he also told Doyle that his business was a sole proprietorship. Even after Kagels obtained the transcript of the recorded statement in May 2013, he did not note in the claim file or mention in any communication with Stewart that Lodigiani had described his business as a sole proprietorship. Such intentional blindness evidences a desire to suppress contradictory evidence in order to maintain Kagels's premature finding of partnership. Indeed, abundant evidence existed tending to show Lodigiani was not engaged in a partnership. This evidence includes, but is not limited to, the following: Lodigiani entered into the plumbing contracts with Yildirim as an individual; there was no oral or written partnership agreement between Lodigiani and Brantley; the plumbing permits necessary for the job were pulled by Lodigiani in his name only; Lodigiani's workers' compensation application identified him as a sole proprietor; Lodigiani was categorized by a Preferred Mutual insurance agent as an "individual" on his businessowner's insurance application, which also indicated he was not, and had not been, involved in any joint ventures, and noted a payroll of $10,000; Lodigiani referred to Brantley as his "employee" on multiple occasions; Brantley was subject to Lodigiani's direction and control; under Massachusetts law, Lodigiani and Brantley could not have formed a legal partnership; there were no joint tax return or joint bank account; and all invoices were in

Lodigiani's name only. Preferred Mutual did not meaningfully evaluate this wealth of information. Rather, it systematically disregarded this and other evidence without good faith consideration. The court concludes genuine consideration of this evidence would have made it reasonably clear to Preferred Mutual that filing declaratory judgment and rescission actions was unjustified.

6.   The decision to rescind during the July 2, 2013 roundtable was unfair in that it was biased against Lodigiani. This bias is implicit in the participants' unanimous agreement to proceed with the rescission and declaratory judgment action with little to no discussion. Asked whether anyone involved in the roundtable "expressed an opinion of believing Mr. Lodigiani," Kagels testified, "I don't recall that, no." Asked whether there "was debate going back and forth," Kagels responded, "I don't recall there being any debate," and that "sometimes people will become a devil's advocate . . . , but I don't recall that happening here." The lack of any level of consideration or even rote discussion of evidence tending to favor Lodigiani's position demonstrates the July 2 roundtable was one of the final steps in the result-oriented investigation that began with Kagels's determination on March 18 that Lodigiani was operating a partnership.

7.   Similarly, Preferred Mutual's July 11 roundtable provides additional evidence of a predetermined conclusion of partnership. Expert witness for Preferred Mutual, Alan Perron ("Perron"), credibly testified such conferences are standard industry practice in deciding whether to file a declaratory judgment action. Perron further testified that the purpose of a roundtable is to give those present the opportunity to "chime in on what their own thoughts are" with respect to a coverage issue. He stated, "[e]veryone is given an opportunity to talk . . . through it" so that the team "hopefully ultimately agree[s] on a strategy going forward on a resolution to whatever you're discussing to [sic] the case." Perron then reiterated that at a

roundtable "there's definitely discussion about what the pros and cons are of bringing [a] coverage issue to fruition . . . . [Y]ou really have to hear some of the other arguments to make sure that you've covered all the bases." As with the July 2 roundtable, no meaningful discussion or debate occurred at the July 11 meeting. This indicates the attendees of that meeting simply accepted and rubber-stamped—without even a discussion of the potential consequences or weaknesses of such a position—a conclusion made months earlier prior to any meaningful investigation by Preferred Mutual. In actuality, the decision to rescind had been made prior to July 11, and the roundtables were void of any meaning other than as a façade of legitimacy.

8. In *Sterlin v. Commerce Ins. Co.*, 25 Mass. L. Rptr. 124, 129 (Mass. Super. Ct. 2009), in which Mass. Gen. Laws ch. 176D, §§ 3(9)(c) and 3(9)(d) were at issue, the court held the investigation by the insurer, Commerce, was misleading and blind to the evidence and factual material that was available, and that this violated chapter 93A. The July roundtables indicate the investigation in this case suffered the same infirmities.

9. Preferred Mutual's filing of a declaratory judgment action further exemplifies its acceptance of and adherence to Kagels's March 18 predetermination. Preferred Mutual acted with certainty on July 22 when it issued the rescission letter to Lodigiani, as evidenced by the lack of debate and unthinking ratification of Kagels's finding of partnership at the July 2 and July 11 roundtables. Preferred Mutual did not intend to wait for the declaratory judgment action to clarify its right to rescission; the action was instead meant to secure a retroactive judicial endorsement of Preferred Mutual's rescission. This was not a situation where rescission was delayed by an ROR while awaiting a court's declaratory judgment determination.[4]

---

[4] Preferred Mutual insists it behaved commendably in filing for declaratory judgment in this case, citing a prior action for declaratory relief against a different insured. *See Preferred Mut. Ins. Co. v. Vt. Mut. Ins. Co.*, 32 N.E.3d 336, 345 n.9 (Mass. App. Ct. 2015). In that case, Preferred Mutual continued to observe its obligations under the policy while declaratory

10. The decision to rescind was unfair because Kagels's determination of partnership was never genuinely or fairly reviewed by anyone at Preferred Mutual. What Preferred Mutual has called an "investigation" was that in name only. Kagels and Preferred Mutual's determination seized on the insured's, a layman, uttering the word "partner" and blindly attributed to him the precise definitional understanding and intent as if he were a practicing attorney specializing in business insurance. Ultimately, Preferred Mutual's so-called investigation did nothing to challenge this characterization or to advance an alternative interpretation.

11. A result-oriented investigation is not a fair investigation. A fair investigation requires an objective review of the facts. A fair investigation does not put the interests of the insurer above those of the insured. Preferred Mutual failed in its duty to be fair, honest, equitable, and reasonable with respect to Lodigiani because it placed its own financial interests—to avoid large claim and defense costs—above those of Lodigiani when it should have placed them on an equal footing. As Bogdan acknowledged, the case "ha[d] the potential of a big

---

judgment was pending. *See id.* at 342–43 ("Preferred appropriately chose to defend under a [ROR] and to file a declaratory judgment action as a means of determining its obligations."); *id.* at 345 n.9 ("Preferred commendably assumed Joseph's defense under a [ROR] and brought a declaratory judgment action as a means to demonstrate . . . that the underlying claims were outside the scope of the Preferred Policy."). In this case, there was no action pending for Preferred Mutual to demonstrate it would continue to observe its obligation until the declaratory judgment action was decided. However, the rescission letter uses clear language and explanation to indicate Preferred Mutual "has rescinded," is "disclaiming" its obligations, and would "obtain" a supportive judicial determination. The letter strongly referenced and relied on Preferred Mutual's "investigation" findings and conclusions. While the letter, in closing, indicates circumstances for reconsideration, it is impossible under the circumstances, including the tone and content of the rescission letter, to believe future reconsideration a genuine possibility. Furthermore, at trial, the court asked Preferred Mutual's expert witness, Perron, the following: "[W]hen the insurance company says we've made a decision to rescind [coverage], here's your premium back, the policy is void . . . that declaratory judgment action is filed seeking approval of the court[.] [I]n the insurance company's mind it's a done deal. The policy is over. It's void. We're not paying that right?" Perron agreed. Preferred Mutual's decision to rescind was a completed act, and the declaratory judgment merely a retroactive judicial evaluation of the rescission's merits. The First Circuit has recognized that a declaratory judgment action may be properly filed to ratify a decision to rescind. *See Indianapolis Life Ins. Co. v. Herman*, 204 Fed. Appx. 908, 909, 911 (1st Cir. 2006) (affirming decision in which an insurance company sought a declaratory judgment to approve its rescission); *Gen. Star Indem. Co. v. Duffy*, 191 F.3d 55, 57, 60 (1st Cir. 1999) (same). In those cases, however, the First Circuit did not speak to the validity of the investigation, if any, preceding rescission or the effect an incomplete investigation would have had on the propriety of the insurance companies' seeking a *post hoc* declaratory judgment. While *post hoc* declaratory judgment may be appropriate in cases of diligent investigation on the part of an insurance company, this court rejects as best practice the filing for declaratory judgment where, as here, it is disingenuously used as a *post hoc* ratification of legally suspect actions by insurance companies intent on disclaiming coverage.

exposure case and [Preferred Mutual] c[ouldn't] ignore the coverage issue at hand." Such a consideration is generally appropriate for an insurance company, but here it made toxic the claim handling and investigative processes.

12. In *Federal Ins. Co. v. HPSC, Inc.*, the First Circuit affirmed the district court's finding that Federal, the insurer, had engaged in an unfair and deceptive business practice by filing a suit for rescission based on a claim of misrepresentation in part because, other than a preliminary inquiry, it conducted no investigation before filing suit. *See generally Federal Ins. Co.*, 480 F.3d 26 (1st Cir. 2007). This case is, in effect, identical. Though an investigation ostensibly followed Kagels's predetermination, that predetermination guided the outcome of that investigation. Kagels's conclusion of partnership was not open to reconsideration regardless of what other information became available. Therefore, as in *Federal*, this case involved no bona fide investigation after the insurer's preliminary inquiry, here regarding the use of the word "partner" at the scene and then during the recorded statement. Accordingly, the investigation was unfair and deceptive in violation of Chapter 93A.

13. There is no merit in Preferred Mutual's argument that it is insulated from liability because its decision to rescind was based on the advice of counsel.[5] The advice and independence of counsel in this case was tainted, selectively parsed, and directed by Kagels. The process of advice-seeking was designed more to garner support for Kagels's foregone conclusion than to actually conduct an investigation in good faith. Generally, there may be little or no recognizable merit to a claim of independent legal review when there exists a longstanding

---

[5] In addition to Stewart's advice, Preferred Mutual attempted to buttress its claim by entering into evidence a letter by Attorney Adam Brand ("Brand"). Brand opined Preferred Mutual's actions with regard to Lodigiani's claim did not violate Chapter 93A. Brand was consulted in October 2014. The decision to file for rescission and declaratory judgment was made in July 2013. It obviously cannot be asserted that Preferred Mutual relied on Brand's opinion in deciding to rescind, and the court finds the entire letter has little persuasive weight when viewed generally as an expert opinion.

business relationship between the company and private counsel; any such determination requires, however, a case by case analysis.

## B. Hostility toward the insured

1. The interests of an insurer should not be placed above the interests of an insured in a coverage investigation such as this one. The two are to be treated as on equal footing. Nevertheless, multiple documents in evidence demonstrate a hostility towards the insured.

2. Preferred Mutual's hostility is reflected in Stewart's May 7 report, which accused Lodigiani of being "wise to [the] fact" that his policy would not cover a partnership and therefore testifying no partnership existed. Stewart continued to unjustifiably cast aspersions on Lodigiani's character in his May 10 email to Kagels, stating, "I don't like the fact that Mr. Lodigiani seemingly changed his story after he lawyered up." On May 22, Stewart stated Lodigiani "ha[d] already demonstrated his willingness to prevaricate and to attempt to change his story after speaking to personal counsel." Preferred Mutual's hostility is perhaps best reflected in Stewart's June 21 letter in which the reference to *Through the Looking Glass* appears. Without any factual basis, these comments assert Lodigiani was lying about his business relationship. There is no evidence suggesting that consulting a lawyer caused Lodigiani to testify untruthfully. Moreover, such a suggestion is an unjustified disparagement of Lodigiani's privately retained counsel.[6]

---

[6] Preferred Mutual's unwarranted criticism of Lodigiani and his counsel is ironic. In its letter to Lodigiani scheduling Lodigiani's first EUO, Preferred Mutual told Lodigiani that he could obtain counsel to represent his interests in the investigation. Yet, once Lodigiani did so, Preferred Mutual proceeded to attack that decision and to draw an inference that Lodigiani was untruthful simply because he hired counsel as Preferred Mutual had advised.

3. Preferred Mutual could have investigated the matter in a much less confrontational manner, as Attorney Stewart suggested in one of his letter to work cooperatively with Lodigiani. Its failure to do so was unreasonable and unfair.

## C. Ageism

1. There are multiple references to age in the record about which the court inquired at trial. In emails and memoranda, Preferred Mutual repeatedly noted Lodigiani was 84 years old and Brantley 80 years old. It was noted early on that Lodigiani may have suffered from "cognitive deficiencies," impliedly because of his old age. Preferred Mutual also noted that he appeared "doddering" at his second EUO.

2. Age was irrelevant as a legitimate consideration to the issue of coverage, as acknowledged by Kagels on two occasions. The first occasion was when Stewart asked Kagels whether the first EUO was necessary to serve an "interest in perpetuating testimony of a very aged person or someone 'in extremis.'" Kagels responded the focus of the EUO was "not perpetuating testimony for the claims." The second occasion was at trial. Asked why age had been repeatedly mentioned in the claim file and communications between individuals at Preferred Mutual, Kagels was unable to give a clear explanation of why Lodigiani's age was relevant to Preferred Mutual's investigation. When asked by the court why "references to age [were] put in [the file]," Kagels responded it was because Lodigiani's age was "unusual" insofar as Preferred Mutual does "not [insure] a lot of octogenarians," making it "a little out of the ordinary." The court pressed, "[J]ust because it's out of the ordinary doesn't give it any useful point of consideration. . . . [W]hat [was] the useful consideration for putting that in there[?]" Kagels stated, "It's hard for me to answer that," and that it "seemed like it was useful information to have in the file." Yet asked whether Lodigiani's age was merely a

"point of interest" as opposed to "useful," Kagels replied, "No, I think it was a point of interest." (*Id.* at 133–34.) Kagels's trial testimony on this point, by way of substance, demeanor, and credibility was especially suspect in that it failed to provide a definitive answer to the question of how Lodigiani's age was pertinent to the purported investigation.

3. Asked why Preferred Mutual might have included references to age in its claim notes, Perron testified, "I don't really know why [Preferred Mutual] mentioned it to be honest with you. I think it was immaterial." Perron further stated, "[P]reserving testimony with an elderly person might be one of the reasons [Preferred Mutual] talked about [Lodigiani's age], but I didn't see those exact words in the file but I saw reference to age."

4. The court finds Preferred Mutual's preoccupation with Lodigiani's age contributed, to some extent, to Preferred Mutual's decision to pursue rescission and declaratory judgment. While age was not the single, decisive motivator of Preferred Mutual's ultimate decision to file suit, the inference that Lodigiani's age was interpreted by Preferred Mutual as a signal of little anticipated resistance to legal action weighs in support of Plaintiff's claim.

## D. Misrepresentation of cooperation clause

1. It was unfair and deceptive for Preferred Mutual to state in a letter from its attorney to Lodigiani that his insurance policy "require[d] [him] to submit to an EUO." Although both the property coverage and liability coverage sections of the Preferred Mutual policy require an insured to "cooperate with [Preferred Mutual] in the investigation and settlement of a claim," only the property coverage section, which does not apply here, states that Preferred Mutual "may examine an insured under oath . . . at such times as may reasonably be required, about any matter relating to this insurance." Even if the court accepts the testimony proffered by Preferred Mutual that the cooperation provision in the liability coverage section

23

permitted Preferred Mutual to take Lodigiani's EUO, Preferred Mutual misrepresented the terms of the insurance by calling the EUO a requirement.

2. In its papers and at trial, Preferred Mutual relied on *MetLife Auto & Home v. Cunningham* to support its contention that an EUO need not be voluntary, and that requiring an EUO was within the bounds of a cooperation clause like that at issue here. 797 N.E.2d 18 (Mass. App. Ct. 2003). Preferred Mutual mischaracterizes the holding in that case. *Cunningham* does not stand for the proposition that a general cooperation clause gives an insurance company the right to require an EUO under the circumstances here. Rather, *Cunningham* states that, pursuant to a cooperation clause, an insured has a duty to "provide accurate information bearing on coverage." *Id.* at 23. The case imposes no obligation to do so by way of EUO. In fact, *Cunningham* suggests, without needing to directly address the point, an objection to providing such information under oath is allowable. *See id.* at 22 (stating issue in the case was not that insured "object[ed] to providing information *under oath*," but rather that he "broadly objected to providing any information in any form" (emphasis in original)). Accordingly, contrary to Preferred Mutual's representation in Stewart's May 27 letter, the general cooperation clause included in the liability section of Lodigiani's policy did not require Lodigiani to submit to an EUO under the particular circumstances of this case.

3. Preferred Mutual could have included an EUO requirement in the liability portion of Plaintiff's policy. Preferred Mutual needed only to incorporate the language of the EUO clause already employed in the property portion of the contract. The court construes this omission as evidence of a decision on Preferred Mutual's part not to require its insureds to submit to an EUO where liability is contested. *See AIG Prop. Cas. Co. v. Green*, 217 F. Supp. 3d 415, 428 (D. Mass. 2016) (stating presence of exclusionary language in some contract

provisions and absence of such language in another suggest latter provision was not meant to encompass the exclusions included in the former).

4. The court does not premise its ultimate conclusion as to liability under chapter 93A on Preferred Mutual's misinterpretation of the law as it pertains to Lodigiani's EUO. However, Preferred Mutual's misconstruction of the precise wording of its complete policy demonstrates, at the very least, a degree of inattention to its insured's rights. This inattention accords with Preferred Mutual's overall poor treatment of Lodigiani over the course of its investigation.

### E. Ethical considerations

1. Preferred Mutual and its agents breached ethical obligations and derived unfair benefit from that unethical conduct to the detriment of the insured.

2. Attorney Doyle failed to fairly navigate the tripartite relationship existing between him, Preferred Mutual, and Lodigiani and breached the ethical boundaries of the tripartite relationship in relaying to Kagels that Lodigiani stated at the fire scene that he and Brantley were "partners." Doyle was aware at this time that he owed a duty to Lodigiani and he had an ethical obligation not to divulge information to Preferred Mutual that would adversely impact Lodigiani's coverage. Because Lodigiani's statement as to partnership was potentially adverse to his interests, Doyle was obligated to maintain confidentiality and not share this information with Preferred Mutual. To the extent Doyle claims he was unaware this information could create a coverage issue, the court is unpersuaded. Based on his considerable, long-term experience in the field, Doyle should have contemplated this potentiality as a basic tenet of insurance-related legal work. In its defense, Preferred Mutual relies on a *post hoc* evaluation by Attorney Brand, who they retained and who opined "it was

appropriate for Attorney Doyle to share factual information about the investigation and/or the defense of the insured with PMIC." Brand quoted comment 12C to Rule 1.7 of the 2014 version of the Massachusetts Rules of Professional Conduct in support of this opinion without analysis of the entirety of the rule or other implicated rules of confidentiality. Yet, Doyle's conduct did not satisfy the prerequisite requirement of client consent. At the scene investigation, when first meeting Lodigiani and noting possible cognitive difficulties, Doyle did not engage Lodigiani in a private conversation, sufficiently explain his specific role in the investigation, define the tripartite relationship, obtain Lodigiani's consent to dual representation, or ensure the nature of this unique representation was understood, all of which are required when representing potentially adverse parties under Rule 1.7. The court gives no weight to Brand's opinion not only because these requirements were not met, but also because Brand completely ignored these important factors, which, unsurprisingly, happened to support Preferred Mutual's position. Doyle's failings at the scene inspection are particularly concerning as Doyle, at this first meeting, noted possible cognitive issues with respect to the insured which necessarily had to be factored into the client consent requirement. Tripartite relationships like this one, even without the complication of cognitive issues, run a high risk of consumer protection, business-practice, and ethical problems. Preferred Mutual allowed this behavior to occur and improved its adversarial position based on advantages conferred by the resulting circumstances.

3. In addition to ineffectually managing the tripartite relationship, Attorney Doyle breached attorney–client privilege. He did so at the scene investigation, where he conducted his first client meeting with Lodigiani in the presence of others, and by relating Lodigiani's partnership statement at the scene inspection to Kagels on March 18.

4.  It was unfair for Kagels to remain involved in the coverage investigation after learning from Doyle that Lodigiani had said he and Brantley were "partners." Plaintiff's expert, Bernd Heinz, testified that where, as here, a liability claims adjuster such as Kagels receives information from defense counsel retained to protect the interests of the policyholder which might adversely impact the insured's right to coverage, the fair and ethical practice is for the claims handler to recuse themselves from any further involvement in the coverage-related aspect of the matter. Instead, a different claims handler unfamiliar with the tainted information should be assigned to complete the investigation. This is known as "splitting the file." Kagels affirmed the existence and appropriateness of using this procedure, acknowledging where "information has come to the first investigator's attention that may not be appropriate for consideration," he would "set up a separate file and then assign a new person to handle that." Kagels testified that in this particular case, information from Lodigiani's counsel that Lodigiani was in a partnership would have potentially been to the detriment of Lodigiani, and that after learning of Lodigiani's statement Preferred Mutual split the file. Yet when asked whether splitting the file achieved the objective of ensuring the "decisionmakers [in Lodigiani's investigation] did not have the information from Attorney Doyle," Kagels stated, "No, we had that information from Attorney Doyle. I continued to handle the coverage claim." This testimony is nonsensical; an investigator does not split a file while remaining assigned thereto and continuing to consider improperly obtained information detrimental to the insured. This court finds Preferred Mutual should have truly split the file once Kagels learned from Doyle of Lodigiani's use of the word "partners."

5.  While unconcerned with the conflicts of interest disadvantaging Lodigiani, Preferred Mutual was careful to safeguard itself against any conflicts. In its March 22 ROR, for example, Preferred Mutual made it a point to inform Lodigiani that the counsel hired for him by

Preferred Mutual was for defense purposes only and could not represent him at his EUO. Lodigiani was informed that he could, however, hire his own counsel. In its March 27 letter scheduling the EUO, Preferred Mutual likewise informed Lodigiani that he "ha[d] the right to have counsel of [his] choosing present during the EUO, so long as that counsel has no conflict of interest with representing you with respect to PMIC's investigation." This is evidence Preferred Mutual was well aware of the potential for conflicts but paid little heed when those conflicts fell in its favor.

### CONCLUSION

For the foregoing reasons, the court concludes Preferred Mutual breached its duties under Mass. Gen. Laws ch. 93A, §§ 2, 11, and that this breach constituted an unfair and deceptive trade practice in violation of Massachusetts law. Accordingly, judgment will enter for Continental with respect to liability. The matter will proceed to the issue of damages, and a status conference will be scheduled by the Clerk's Office.

It is So Ordered.

  /s/ Mark G. Mastroianni         
MARK G. MASTROIANNI
United States District Judge